**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-24126-RAR**

**JEWISH VOICE FOR PEACE,**
**SOUTH FLORIDA**,

      Plaintiff,

v.

**CITY OF MIAMI BEACH**, *et al.*,

      Defendants.

_____/

**ORDER DENYING EXPEDITED MOTION FOR PRELIMINARY INJUNCTION**

      **THIS CAUSE** comes before the Court on Plaintiff's Expedited Motion for Preliminary Injunction ("Motion"), [ECF No. 40].  Plaintiff Jewish Voice for Peace, South Florida ("JVP") seeks a preliminary injunction against Defendant City of Miami Beach to protest on the public sidewalk outside the Miami Beach Convention Center during Art Basel on December 6, 2025.[1] *See generally* Mot.  On November 12, 2025, Defendant filed a response opposing the preliminary injunction ("Response"), [ECF No. 44], to which Plaintiff replied on November 14, 2025 ("Reply"), [ECF No. 52].  The Court held an evidentiary hearing on the Motion on November 14, 2025 ("Hearing"), [ECF No. 53].  For the following reasons, it is hereby

      **ORDERED AND ADJUDGED** that Plaintiff's Expedited Motion for Preliminary Injunction is **DENIED**.

**BACKGROUND**

      Plaintiff JVP is the South Florida Chapter of a national organization that "mobilize[s]

---

[1]  In its Motion, Plaintiff does not provide a specific date for the protest.  However, as stated on the record at the November 14, 2025 Hearing, [ECF No. 53], Plaintiff seeks to protest on Saturday, December 6, 2025.  *See* Transcript of Hearing ("Hearing Tr."), [ECF No. 63] at 76:16–76:17.

Jewish communities to advocate for a just society in Palestine and Israel rooted in human rights rather than oppression."  Compl., [ECF No. 1] ¶ 14.  Since October 2023, "[m]embers of the Plaintiff organization . . . have joined [] protests [against Israel's actions] in South Florida, including in the City of Miami Beach."  *Id*. ¶ 2.

On September 10, 2025, JVP filed its Complaint, alleging four causes of action, all of which allege violations of JVP's First Amendment rights.  The first, second, and fourth causes of action relate to an ordinance "that authorizes the police to order any protester standing on a public sidewalk to move from the sidewalk," *id*. ¶ 8, and allege that this ordinance is invalid because it is overbroad, vague, and has been enforced against Plaintiff due to Defendants' hostility towards JVP's views about Israel.  *Id*. ¶¶ 88–90; 92.  The third cause of action alleges that Defendants "have limited Plaintiff's right to protest by ordering that they move from public places at which they have a right to be."  *Id*. ¶ 91.  In furtherance of this right to protest, on November 7, 2025, Plaintiff filed an Expedited Motion for Preliminary Injunction "to secure its First Amendment right to protest peacefully on the public sidewalk outside the Miami Beach Convention Center during 2025 Art Basel, which will be held from December 5 to 7."  Mot. at 1.[2]

Art Basel is "one of the world's largest art fairs."  Mot. at 3.  Held each year in Miami Beach, "thousands of attendees pass[] through the Convention Center, Miami Beach's largest meeting venue."  Resp. at 13.  As Art Basel has become increasingly popular and attendance has grown, the event has "evolved outside of the convention center[,]" becoming a "weeklong collective of art-centric events across the area" known as "Miami Art Week."  Shayne Benowitz, *History of Art Basel Miami Beach*, GREATER MIAMI CONVENTION & VISITORS BUREAU (Oct. 5, 2025), https://www.miamiandbeaches.com/events/art-basel/history-of-art-basel-miami-beach.

---

[2]  In the event of any discrepancy between the page numbers in the footer of a document and those in the CM/ECF heading, the page numbers used herein refer to the page number reflected in the CM/ECF heading.

Indeed, "concomitant shows" include Art Miami and Design Miami, as well as numerous smaller shows throughout the greater Miami area.  Harriet Powell, *The Impact of Global Art*, GLOBAL MIAMI (March 4, 2024), https://globalmiamimagazine.com/2024/03/04/the-impact-of-global-art/.  In 2025, Miami Art Week is anticipated to have at least twenty fairs.  *Quick Guide to Miami Art Week Fairs*, GREATER MIAMI CONVENTION & VISITORS BUREAU (Oct. 4, 2025), https://www.miamiandbeaches.com/events/art-basel/miami-art-week-fairs.

In 2024, Art Basel generated an estimated $547 million in economic activity and attracted over 75,000 attendees.  *Art Basel Miami Beach 2024: Art, Culture, and Global Connections*, MIAMI BEACH (Dec. 2024), https://www.miamibeachfl.gov/art-basel-miami-beach-2024-driving-economic-and-cultural-growth.  As Art Basel has risen in notoriety, so too have its attendees. Every year, thousands of celebrities, artists, and dignitaries flock to Miami to participate in the art fair and the festivities surrounding it.[3]  Given both the scale and the high-profile nature of the event, "Art Basel is subject to its own careful event planning and coordination and is closely monitored by law enforcement and security staff for threats to the safety and security of attendees, such as suspicious packages and terrorist or other violent threats."  Resp. at 13.

Since October 2023, JVP has protested at Art Basel, and at other high-profile events in Miami Beach.  Plaintiff and Defendant offer competing characterizations of these prior protests. Defendant City of Miami Beach alleges that the first large JVP demonstration was held on Veteran's Day, November 11, 2023.  Resp. at 4.  Defendant determined that police monitoring would be necessary given the number of participants, and, despite "initially agree[ing] to stay on the beachwalk, rather than the main Ocean Drive sidewalk for safety and security reasons, the crowd [which grew to 500 people] eventually covered the full width of Ocean Drive itself."  *Id.*

---

[3]  Former Mayor of Miami Beach Dan Gelber has remarked that "More private jets show up to Art Basel than to the Super Bowl."  *See infra* Powell, *The Impact of Global Art*.

Defendant further alleges that as the crowd began to move down Ocean Drive, police were forced to temporarily close a portion of the road, as the protest "reached a point of contention, with JVP protesters on the road and pro-Israel counter-protesters on the side, and only a small number of police officers keeping them separated." *Id*. Plaintiff does not respond to Defendant's allegations regarding this Veteran's Day protest in its Reply, but at the Hearing noted that it was "the [police] officers [who] came to the conclusion that they wanted to close off Ocean Drive. But it wasn't the protestors that caused that. It was the officers because they were not sure whether anybody had weapons . . . [,] anticipated potential safety [concerns] . . . [, and] were trying to protect against [] potentially a conflict between the protestors and counter-protestors." Hearing Tr. at 14:10–20.

Another protest took place at Art Basel on December 8, 2023, where JVP members "gathered on the sidewalk in front of the Miami Beach Convention Center to protest Israel's actions in Gaza." Compl. ¶ 6; Mot. at 3. Throughout the duration of this protest, JVP members stood on the sidewalk in front of the entry and exit point to the Convention Center, held signs including a 60-foot-long banner with the words "Let Palestine Live," and "handed out leaflets expressing their opposition to Israel's actions in Gaza and urging officials from the City of Miami Beach and Miami-Dade County to divest from Israel Bonds." Mot. at 3. Despite having made security plans "to direct protestors to an area across the street from the Convention Center as they arrived," Defendant determined that "it would risk creating more conflict to get the demonstrators to relocate and decided to allow them to remain where they were set up on the sidewalk in front of the Convention Center." Resp. at 5. Defendant therefore employed police officers "both inside and outside of the crowd, with some floating to help keep pedestrian traffic flowing and to try to prevent verbal confrontations from becoming physical altercations." *Id*. Plaintiff acknowledges there was a "large police presence" at this protest and that it ultimately resulted in two arrests. Mot. at 3; Reply at 3. Specifically, according to Plaintiff, "a young man approached the

demonstration, and [was arrested] after a brief exchange with a police officer."  Clauss Reply

Decl., [ECF No. 52-1] ¶ 7.  And after "[h]is sister came to help him [] she too was arrested."  *Id.*

Defendant also alleges that the day after the 2023 Art Basel Protest, JVP protestors

participating in a "death in" demonstration marched along 17th Street toward South Beach and

were met with hecklers and counter-protestors.  Resp. at 6.  When "the crowd eventually overcame

police" the officers were forced "to deploy pepperballs to disperse the crowd."  *Id.*  Plaintiff

maintains that "[i]t is not true that JVP organized that demonstration."  Clauss Reply Decl., [ECF

No. 52-1] ¶ 8.

On March 11, 2024, JVP once again sought to protest on the sidewalk in front of the

entrance and exit to the Convention Center at the Aspen Ideas Climate Conference.  Mot. at 4.

Given the 2,000 individuals in attendance, many of which included "high-level government

officials, foreign dignitaries, and celebrities[,]" the Miami Beach Police established "a Security

Zone for the convention, pursuant to which officers closed certain streets and sidewalks

surrounding the Convention Center to pedestrian and vehicular traffic and only those holding

entrance credentials were permitted to enter the Security Zone at designated checkpoints."  Resp.

at 5.  As part of this plan, JVP was permitted to protest in a designated area, located at the corner

of nearby Pride Park.[4]  Mot. at 4–5; Resp. at 6–7.  Dissatisfied with this location, JVP protestors

"moved to the corner of 17th Street, to the east side of City Hall, and across from the Convention

Center."  Resp. at 7.  Plaintiffs contend that, even after moving to this location, "they could not

interact with, or hand pamphlets to, those people who came and went to the conference via other

---

[4]  While Defendant alleges that protestors "could be seen and heard by many attendees when traveling to
and from the Climate Convention[,]" Resp. at 7, Plaintiff contends that this zone "was so far from the
Convention Center that the protesters could neither be seen nor heard by conference attendees."  Mot. at 4–
5.

routes, nor with those people who came out of the conference and stood on the sidewalk during breaks." Mot. at 5.

At Art Basel last year, JVP sought to demonstrate, as it had in 2023, on the sidewalk in front of the Convention Center. Mot. at 7. In light of concerns "including [prior] conflicts between protesters and counter-protesters that had resulted in road closures, arrests, and deployment of pepperballs, and the crowding of the Convention Center entrance[,]" Miami Beach Police "created a designated Event Zone [to] minimize[] the opportunity for congregating on sidewalks and high traffic areas surrounding the Convention Center and prohibited all commercial activity, loitering, and activity that would increase the volume of pedestrians and reduce the ability of law enforcement to identify potential security threats." Resp. at 7–8. A "Designated Protest Area" was created adjacent to the Event Zone, where police officers directed protestors, including JVP members, airline pilots, and Jehovah's Witnesses. Mot. at 7–8; Resp. at 8. Defendant alleges that despite being advised that the demonstration would be static, JVP members marched towards and along Lincoln Road, at which point "there were conflicts and physical altercations between protesters and hecklers/counter-protesters, and a demonstrator and counter-demonstrator were each arrested for battery." Resp. at 8.

JVP now files its Motion, seeking to protest, as it did in 2023, on the sidewalk directly in front of the Convention Center on December 6, 2025. Defendant opposes the Motion, citing concerns such as interferences with "the ingress and egress of event attendees entering and leaving Art Basel" and "the ability of officers to conduct security surveillance that is standard for an event the size of Art Basel." Resp. at 2. Defendant filed its 2025 Special Event Action Plan ("Event Plan") under seal on November 21, 2025, along with two supplemental declarations and a supplemental memorandum. *See* [ECF No. 60]. The Event Plan creates an "Event Zone" surrounding the Convention Center and its periphery, and offers protesters a "Reasonable Time,

Place, and Manner (RPTM) protest area," ("Designated Protest Area") in the same location as 2024—the corner of 17th Avenue and Convention Center Drive.  Event Plan, [ECF No. 60-1] at 3–5.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).  The Court will not issue an injunction unless "the movant demonstrates all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (citing *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001)).  The failure to meet even one of these requirements "dooms" any request for injunctive relief.  *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).  Thus, "[where] the plaintiffs have not shown a substantial likelihood of success on the merits, [the Court] need not consider the remaining factors in the preliminary injunction test." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1329 (11th Cir. 2015).

## ANALYSIS

The Court begins by addressing whether Plaintiff has met its high burden of establishing a likelihood of success on the merits.  *See Pine v. City of W. Palm Beach, Fla.*, No. 13-80577, 2013 WL 5817651, at *3 (S.D. Fla. Oct. 29, 2013) ("In the First Amendment context, the question [of whether a district court may grant injunctive relief] is [often] reduced to the question of whether

the Plaintiff is likely to succeed on the merits[.]").  In a public forum, like the sidewalk on which Plaintiff seeks to protest, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, so long as the restrictions '[1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant governmental interest, and . . . [3] leave open ample alternative channels for communication of the information.'" *Pine v. City of W. Palm Beach, FL*, 762 F.3d 1262, 1268–69 (11th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  The Court examines each of these factors in turn.

### I.   Defendant's Event Plan is Content Neutral

Content neutral restrictions are those that "serve[] purposes unrelated to the content of the expression . . . [and are] *justified* without reference to the content of the regulated speech."  *Ward*, 491 U.S. 781, 791–92 (internal quotations and citations omitted).  Defendant contends that its Event Plan is content neutral as it "restrict[s] all persons congregating on sidewalks and high traffic areas surrounding the Convention Center."  Resp. at 12.  Indeed, the record shows that at least two other protest groups—airline pilots and Jehovah's Witnesses—were also directed to the Designated Protest Area during Art Basel in 2024.  Diaz Decl., [ECF No. 44-1] ¶ 46.  The restriction therefore applies equally to all protestors, without regard for the content of any particular message.  *See, e.g.*, *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1317 (11th Cir. 2000) ("The [] Ordinance applies equally to all festivals of any kind without regard to the content of any message the festival sponsor might convey.").  Further, Plaintiff does not allege that Defendant's actions were content-based in its Motion and Reply, and conceded the content neutrality prong at the Hearing.  Hearing Tr. at 43:4–18.[5]  Thus, "[b]ecause

---

[5]  Plaintiff, in its Opposition to Defendant's Supplemental Memorandum, contests the content neutrality prong of this inquiry, arguing that although "the City's exclusion of JVP from the Convention Center by

the parties do not dispute that the [restriction] is content neutral, we examine the second and third

prongs." *Pine*, 762 F.3d at 1269.

## II.  Defendant's Restriction is Narrowly Tailored in Furtherance of a Significant Governmental Interest

"For a content-neutral time, place or manner regulation to be narrowly tailored, it must not

'burden substantially more speech than is necessary to further the government's legitimate

interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799).  This

inquiry is generally conducted in two steps.  Courts first consider the legitimacy and significance

of the stated governmental interests, then determine "whether there is a 'reasonable fit' between

those interests and the [restriction], as the [government's] chosen means for serving them." *Coal.*

*for the Abolition of Marijuana Prohibition*, 219 F.3d at 1318 (quoting *City of Cincinnati v.*

*Discovery Network, Inc.*, 507 U.S. 410, 416 (1993)).  And while the regulation must "promote[] a

substantial government interest that would be achieved less effectively absent the regulation[]" it

does not have to be "the least restrictive or least intrusive means" of furthering the interest. *Ward*,

491 U.S. at 798–99 (internal quotation and citations omitted); *see also Pine*, 762 F.3d at 1269.

Thus, a Court "cannot invalidate a regulation simply because it 'concludes that the government's

interest could be adequately served by some less-speech-restrictive alternative.'" *McDonald v.*

*City of Pompano Beach, Fla.*, 556 F. Supp. 3d 1334, 1357 (S.D. Fla. 2021) (quoting *Ward*, 491

U.S. at 800).

---

means of an 'Event Plan' is, on its face, neutral, several factors make it clear that its purpose is not."
Plaintiff's Supp. Resp., [ECF No. 62] at 5.  However, Courts "consider[] whether a law is content neutral
on its face *before* turning to the law's justification or purpose." *Reed v. Town of Gilbert, Ariz.*, 576 U.S.
155, 166 (2015).  And "[g]overnment regulation of expressive activity is content neutral so long as it is
justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791–92 (internal
quotations and citations omitted).  Here, because the restriction is content neutral, it is "subject to a lower
level of scrutiny", and the Court need not inquire into the legislative purpose. *See Reed*, 576 U.S. at 166.

### i.   *Defendant has advanced legitimate and significant governmental interests*

Defendant offers three governmental interests as justification for not permitting Plaintiff to protest on the sidewalk in front of the Convention Center: (1) its "significant interest in public safety and security during major events such as Art Basel" and its related "interest in maintaining the orderly flow of pedestrian traffic and allowing the safe ingress and egress of Convention Center attendees"; (2) its "significant interest in protecting high-level government officials attending conferences against potential threats"; and (3) its "significant interest in the safety and security issues that may arise, and have arisen, during the demonstrations, including potential conflicts between protesters and counter-protesters and even passersby."  Resp. at 13–16.[6]   In support of these interests, Defendant submits a declaration from Lieutenant Raymond Diaz, [ECF No. 44-1] ("Diaz Decl."), Lieutenant of Police in the Technical Operations Division of the City of Miami Beach Police Department.  Diaz Decl. ¶ 2.

The Court finds that each of Defendant's stated interests are substantial matters of legitimate public interest.  *First*, "ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks" are legitimate governmental interests.  *McCullen*, 573 U.S. at 487 (internal quotation and citation omitted) ; *see also Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1183 (11th Cir. 2009) ("We recognize that police may properly limit the exercise of free speech where necessary for the safety and protection of protestors and the community."); *Int'l Caucus of Lab. Committees v. City of Montgomery*, 111 F.3d 1548, 1551 (11th Cir. 1997) ("It is well settled

---

[6]  In Defendant's Supplemental Memorandum in support of its Event Plan, it proffers at least two additional interests: (1) that "[r]ecent changes to Florida's open carry laws also necessitate a more controlled environment to ensure public safety"; and (2) that "early voting for City elections will be taking place at the City Hall campus" during JVP's protest.  *See* Def.'s Supp. Mem., [ECF No. 60] at 4.  Given that these additional grounds were neither advanced in Defendant's Response nor at the Hearing, the Court declines to consider them.

that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." (internal quotations and citations omitted)).

Here, Defendant has an interest in safety and security, given that Art Basel is "closely monitored by law enforcement and security staff for threats to the safety and security of attendees, such as suspicious packages and terrorist or other violent threats." Diaz Decl. ¶ 20. Thus, "[t]he presence of additional people congregating in large groups around the Convention Center—and particularly its entrance—increases the number of people and movement for law enforcement to monitor and reduces their ability to identify potential safety threats." *Id.* And Plaintiff's 2023 Art Basel protest near the entrance of the Convention Center, "interfered with the ingress and egress of event attendees as well as with the ability of officers to conduct security surveillance that is standard for an event of this size[]," according to Lieutenant Diaz. Diaz Decl. ¶ 25. Thus, public safety and security are of tantamount concern to Defendant, especially considering the nature of the event and the volume of visitors. *See Bloedorn v. Grube*, 631 F.3d 1218, 1238–1239 (11th Cir. 2011) ("[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51 (1981)).

*Second*, Defendant has a legitimate interest in providing security to Art Basel's high-profile attendees. Indeed, at the 2024 Aspen Climate Conference, to protect the approximately 2,000 high-level government officials, foreign dignitaries, and celebrities in attendance from "attacks involving explosives and weapons" as well as to "ensure unobstructed emergency access into and out of the Convention Center Campus [] and to preserve orderly traffic flow into and around the Convention Center[,]" Defendant established a Security Zone around the Convention Center and created a Designated Protest Area. Diaz Decl. ¶¶ 28–31. In support of this interest, Defendant

relies on *Citizens for Peace in Space v. City of Colorado Springs*, where the Court upheld a security zone pursuant to a NATO conference, finding that "there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order." 477 F.3d 1212, 1221 (10th Cir. 2007); *see also Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1183 (11th Cir. 2009) (discussing *Citizens for Peace in Space*, noting that "the court [in that case] held that these restrictions were permissible in light of the significant government interest in preventing terrorist attacks at the NATO meeting[.]"). Defendant also cites to *Marcavage v. City of New York*, where the Court upheld a "no-demonstration" zone during the Republican National Convention, due to the "extraordinary" security challenge presented by the 50,000 attendees, including the Vice President, President, and "a host of other government officials." 689 F.3d 98, 105 (2d Cir. 2012); *see also Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 12 (1st Cir. 2004) (upholding designated "demonstration zone" at the Democratic National Convention and noting "there can be no doubting the substantial government interest in the maintenance of security at political conventions.").

Plaintiff responds that such cases are distinguishable "because they involve concerns about the safety of high-level government officials" and posits that Defendant cites "no cases involving art exhibits[, which] are hardly an issue of national security." Reply at 1–2. But while Art Basel may have started as a mere art exhibition, it has become the most renowned international art festival in the world, attended by thousands of high-profile individuals from all walks of society. To conclude, as Plaintiff suggests, that the security interest present at Art Basel is that of a normal art exhibit is tantamount to analogizing the World Cup to a children's soccer tournament. And the mere fact that Art Basel is not inherently "political" or "governmental" in nature, like a NATO conference or a political party convention, does not suggest the absence of serious security concerns. On the contrary—given Art Basel's size, scope, and stature, it is no surprise that heightened security measures are required. *See Int'l Caucus of Lab. Committees*, 111 F.3d at 1551

("To demonstrate the significance of its interest . . . the City is entitled to advance its interests by arguments based on appeals to common sense and logic." (internal quotation and citation omitted)).

*Third*, Defendant asserts its "significant interest in the safety and security issues that may arise, and have arisen, during the demonstrations, including potential conflicts between protesters and counter-protesters and even passersby."  Resp. at 15.  As evidence of the types of conflicts that may arise, Defendant cites "prior event history involving [JVP]" which resulted in "physical altercations, a handful of arrests, the deployment of pepperballs after the crowd overcame police, and, at another event, the temporary closure of Ocean Drive."  *Id*. at 15–16 (citing Diaz Decl. ¶¶ 36, 44).  Plaintiff dismisses such concerns as "speculative," contending that Defendant "has never offered any factual basis for those concerns."  Reply at 2; Mot. at 11.  But "a governmental entity, charged with the well-being of its citizens, shouldn't have to wait for accidents to happen . . . before it can implement the regulations it believes are necessary to promote the general welfare."  *McDonald*, 556 F. Supp. 3d at 1360 (citing *Evans v. Sandy City*, 944 F.3d 847, 858 (10th Cir. 2019) (noting that the First Amendment "does not require the government to wait for accidents to justify safety regulations")).  Governments are also entitled to "us[e] past experience to plan for future events[.]"  *Bl(a)ck Tea Soc'y*, 378 F.3d at 13–14 (discussing how the government's use of past experience to plan for future events "is consistent with the approach adopted in the Court's time-place-manner jurisprudence." (citing *Hill v. Colorado*, 530 U.S. 703, 728–729 (2000) and *Rock Against Racism*, 491 U.S. at 796–97)).

The Court considers only the limited record provided by the parties at this stage of the proceedings.  It is without question that Lieutenant Diaz's declaration, proffered by Defendant, indicates that prior protests generated some unrest.  Diaz Decl. ¶ 36.  And Plaintiff's Reply Declaration of Jenneva Clauss, [ECF No. 52-1], does not refute the fact that such demonstrations

have generated a level of unrest requiring heightened security—and may do so again.  Further, even assuming the protests do not demonstrate an imminent threat to public safety and security, a protest at Plaintiff's desired location would require significant police presence and monitoring to ensure the safe ingress and egress of event attendees.  Diaz Decl. ¶ 39.  This "reduces the ability of law enforcement and security staff to identify potential threats to the safety and security of attendees" in this critical area.  Diaz Decl. ¶ 37.

Given this record before the Court, Plaintiff has not shown that Defendant's concerns are "merely speculative."  *See* Plaintiff's Supp. Resp., [ECF No. 62] at 2 (citing *Flanigan's Enters., Inc. of Georgia v. Fulton Cty*, 242 F.3d 976, 986 (11th Cir. 2001) (explaining that "where the right to free speech is at issue, the government bears the burden of showing that the articulated concern has more than merely speculative factual grounds.")).  Nor has Plaintiff established its entitlement to preliminary injunctive relief.  *See Wreal, LLC*, 840 F.3d at 1247 ("[Movant] bears the burden of persuasion to clearly establish all four of the[] [preliminary injunction] prerequisites." (internal quotations and citation omitted)).  Instead, Plaintiff merely points to cases like *Flanigan's Enters., Inc. of Georgia* and *Buehrle v. City of Key W.*, 813 F.3d 973, 980 (11th Cir. 2015), in an effort to dispel Defendant's legitimate governmental interest.  But these cases were decided at the summary judgment stage with the benefit of a complete record.  *See Pine*, 762 F.3d at 1276 (noting that "this matter is before the Court only on the question of the extraordinary and drastic remedy of a preliminary injunction [and that] Appellants remain free on a full record to pursue [] other relief." (internal quotations and citations omitted)).

The Court is not in a position to second guess the security concerns presented by Defendant and supported by Lieutenant Diaz's declaration.  Plaintiff is correct that courts have "an obligation to carefully examine a government's claim that it has an interest in imposing speech restrictions." Reply at 6.  But Defendant has presented sufficient evidence at this stage of the proceedings to

support its substantial and significant interests in promoting public and event safety, protecting its attendees, and allocating its resources and personnel in a way that furthers these interests.

### ii.   *A reasonable fit exists between Defendant's interests and the restriction*

Finding that Defendant's "stated purposes for the [restriction] are legitimate and significant," the Court turns to "whether there is a reasonable fit between those interests and [the restriction], as the City's chosen means for serving them." *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1318 (internal quotation and citation omitted). Here, the inquiry turns on whether Defendant's substantial interests "would be achieved less effectively absent the regulation" and whether "the means chosen are not substantially broader than necessary to achieve the government's interest." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1295 (11th Cir. 2021) (quoting *Ward*, 491 U.S. at 799–800). That said, a restriction will not be invalidated "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800; *see also Fort Lauderdale Food Not Bombs*, 11 F.4th at 1296 ("[T]he mere availability of less restrictive alternatives will not cause a regulation to fail narrow tailoring scrutiny . . . .").

As explained above, Defendant's substantial interests in public safety and event security would be achieved less effectively if JVP and other protest groups were permitted to demonstrate directly in front of the entry and exit to the Convention Center. The Event Plan creates a Designated Protest Area around the perimeter of the convention center and the surrounding area to "facilitate safe ingress and egress within Art Basel and Design Miami, . . . minimize the risk of unreasonable congestion in high-traffic areas" and ensure "law enforcement and security staff's ability to identify potential threats to attendee safety and security." Event Plan, [ECF No. 60-1] at 4. Plaintiff posits that Defendant's interests would not be impacted by permitting JVP to protest in front of the Convention Center because, as in past protests, the presence of an "ample number

of police" will have "little difficulty keeping order." Mot. at 11. Plaintiff further explains that "[i]f there were a large number of protesters on the Convention Center's 30-foot-wide sidewalk that actually did cause congestion or block entrances, then the police could merely require that the protesters move away from the entrances or spread out over a greater portion of the 1000-foot-long sidewalk." Plaintiff's Supp. Resp., [ECF No. 62] at 4.

But these arguments underscore *why* Defendant's interests may be undermined if the City of Miami Beach cannot implement its Event Plan. It is true that police may be able to effectively diffuse any potential conflict or unrest and order protesters to spread out along the sidewalk should congestion increase. But the fact that law enforcement officers stationed directly in front of the Convention Center would need to direct their attention and resources towards protest groups lessens their efficacy in ensuring traffic and event safety for those entering and exiting the event. Further, Plaintiff's assurances that the protest will be peaceful—and that any past unrest was caused by protestors unaffiliated with JVP, *see* Clauss Reply Decl., [ECF No. 52-1] ¶¶ 7–8—is of no moment. The Event Plan's restrictions apply to all individuals seeking to protest directly outside the Convention Center and security risks remain regardless of protestor affiliation. *See Marcavage*, 689 F.3d at 107 ("The policy 'should not be measured by the disorder that would result from granting an exemption solely to [Plaintiffs]' because if these two plaintiffs were allowed a dispensation, 'so too must other groups,' which would then create 'a much larger threat to the State's interest in crowd control' and security." (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 685 (1992)).

In sum, should JVP and other protest groups be permitted to protest directly in front of the Convention Center, it would lessen the efficacy of Defendant's safety and security protocols, as well as negatively impact law enforcement's allocation of resources. Diaz Suppl. Decl., [ECF No. 60-2] ¶ 5 (identifying factors that the Miami Beach Police have considered in preparing the Special

Event Action Plan); *see also Citizens for Peace in Space*, 477 F.3d at 1224 (noting, in response to plaintiff's argument that "officer staffing levels [] were adequate to assure the peacefulness of their demonstration" that "security planning is necessarily concerned with managing potential risks, which sometimes necessitates consideration of the worst-case scenario.").

Next, the Court must consider whether Defendant's chosen means are substantially broader than necessary to achieve their governmental interests.  Plaintiff argues that the location of the Designated Protest Area—the corner of 17th Avenue and Convention Center Drive, directly adjacent to the Event Zone—excessively moves JVP some 150 yards or 450 feet from their desired protest location at the entrance and exit to the Convention Center.  Plaintiff's Supp. Resp., [ECF No. 62] at 1.  At the Hearing, Plaintiff directed the Court to two cases in support of its position that this restriction is not narrowly tailored.  In *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357 (1997), Plaintiff contends that the Supreme Court struck down a regulation moving protestors 35 feet away from the entrance of an abortion clinic.  Hearing Tr. at 26:3–8.  However, the Supreme Court did no such thing.[7]  While it struck down the "floating [15–foot] buffer zones[,]" it upheld the "fixed buffer zones around the doorways, driveways, and driveway entrance [as] necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots [could] do so."  *Schenck*, 519 U.S. at 377–80.  And in *Madsen v. Women's Health Ctr., Inc.*, a case that *Schenck* relies on, the Court upheld the "36-foot buffer zone as applied to the street, sidewalks, and driveways 'as a way of ensuring access to the clinic.'"  *Id*. at 373 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768–69 (1994)).  In any event, the Court finds

---

[7]  Upon review of the relevant case law and the record, it appears that Plaintiff may have intended to cite *McCullen v. Coakley*, where the Court found that a 35-foot buffer zone was not narrowly tailored.  573 U.S. at 495.  Specifically, the Court found that the government "ha[d] not shown that it seriously undertook to address the problem with less intrusive tools readily available to it."  *Id*. at 494.  The Court also finds this case distinguishable, not only due to the differing safety concerns between an abortion clinic and Art Basel, but also because Defendant here *has* provided evidence that it considered and rejected various alternatives for the location of the Designated Protest Area.  *See* Diaz Suppl. Decl. ¶¶ 11–14.

these cases to be inapposite.  While there may be safety concerns when entering and exiting an abortion clinic, the number of people who do so daily pales in comparison to the number of individuals who will enter Art Basel through the Convention Center.  And, in any event, *Schenck* and *Madsen* did find certain buffer zones designed to provide access to the clinics to be narrowly tailored.

Plaintiff also directed the Court to *Amnesty Int'l, USA v. Battle*, where protesters were impermissibly cordoned 50 to 75 yards away from their desired protest area.  559 F.3d at 1181; Hearing Tr. at 26:9–14.  Relying on *Amnesty Int'l, USA*, Plaintiff maintains that "the mere presence of a large number of people in [an] area" is insufficient to justify the "complete deprivation of [Plaintiff's] right to pass out literature."  *Id.* at 77:24–78:4 (quoting *Amnesty Int'l, USA*, 559 F.3d at 1181–82).  Yet the facts here are readily distinguishable.  The Free Trade Association Meeting at issue in *Amnesty Int'l, USA* included "hundreds of people"—not the thousands expected at Art Basel—and the demonstrators there were entirely "prevent[ed] [] from . . . passing out literature."  559 F.3d at 1181.  Here, significantly more is at stake given the nature of Art Basel.  It is not simply "a large number of people in [an] area," but an international large-scale event attended by thousands of celebrities, artists, and dignitaries.  *Id.* at 1182.  And, as noted below, Defendant has not entirely deprived Plaintiff of its right to communicate with Art Basel attendees, pass out literature in support of its message, and urge attendees to sign a petition.

The Court finds cases like *Bl(a)ck Tea Soc'y*, *Marcavage*, and *Citizens for Peace in Space* instructive in its analysis.  In these cases, the First, Second, and Tenth Circuits upheld plans similar to, if not more restrictive than, the one designed by Defendant.  *See, e.g.*, *Bl(a)ck Tea Soc'y*, 378 F.3d at 10–12, 14 (upholding denial of preliminary injunctive relief to modify the city's demonstration zone which put protestors in "an enclosed space [akin] to a pen" that was located on the edge of the "highly secure hard zone in the area immediately surrounding the [Convention]

Center[,]" noting that although the city's measures were "extreme" they were "nonetheless narrowly tailored" and "[not so] unreasonable as to constitute an abuse of discretion."); *Citizens for Peace in Space,* 477 F.3d at 1218 n.2, 1220 (finding city's security plan, where plaintiffs were permitted to conduct their protest at Checkpoint 1, approximately 310 yards from the front of the conference center, to be "narrowly tailored to advance its significant security interest because the security zone . . . directly and effectively protected the conference from the threat of terrorism, explosives, and violent protests."); *Marcavage,* 689 F.3d at 106 ("The no-demonstration zone was narrowly tailored to achieve significant government interests.  The restricted zones were confined to a two-block stretch of Seventh Avenue and were in place only during the four days of the Convention. And the policy was tailored to meet the congestion and security challenges that the Convention presented.").

The common thread in these cases is the authorization of an event security zone, where protestors were allowed to demonstrate in an area outside of—but adjacent to—the zone, given the substantial governmental interest in security associated with a large-scale, high-profile event.  This makes sense, in light of the fact that "the significance of the government interest bears an inverse relationship to the rigor of the narrowly tailored analysis." *Citizens for Peace in Space*, 477 F.3d at 1221.  Plaintiff contends that narrow tailoring here "requires that the City avail itself of the simple expedient of setting up checkpoints at Convention Center entrances where police officers can examine handbags, backpacks and the like." Plaintiff's Supp. Resp., [ECF No. 62] at 4.  But this argument "assumes a standard far more strict than that at play here[,]" where only a reasonable fit is required.  *Citizens for Peace in Space*, 477 F.3d at 1223.

The Court finds that the Designated Protest Area is reasonable in light of the heightened security concerns.  And Defendant presents evidence that a number of other protest areas were considered and rejected for legitimate reasons.  Diaz Suppl. Decl. ¶¶ 11–14 (discussing

considerations such as leaving clear designated areas for emergency evacuation, ensuring the safe and orderly flow of traffic in the ride share and shuttle drop-off zone, and obstructing public access to outdoor art installations).  Accordingly, the Court finds that Defendant's chosen means, while not perfect, are not substantially broader than necessary to achieve its significant interests.

### III.   Defendant's Restriction Leaves Open Ample Alternatives for Communication

Given that Defendant's restriction is content neutral and narrowly tailored to serve a significant governmental interest, the final issue for the Court's consideration is whether Defendant's restriction fails to leave open ample alternatives for communication.  *Ward*, 491 U.S. at 802.  While "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places," Defendant's restriction "may be invalid if the remaining modes of communication are inadequate."  *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (citing *Heffron*, 452 U.S. at 647). "The ample alternative channels analysis cannot be conducted in an objective vacuum, but instead it must give 'practical recognition' to the facts giving rise to the restriction on speech."  *Citizens for Peace in Space*, 477 F.3d at 1226 (noting that "[t]o treat the ample alternative channels analysis as wholly independent disconnects it from reality and diminishes the emphasis courts have traditionally placed on the importance of the government interest.").

Plaintiff contends that Defendant has denied "Plaintiff its First Amendment right to be seen and heard by, and interact with, its intended audience."  Mot. at 12.  In support of this contention, Plaintiff offers a declaration from a protestor who states that the Designated Protest Area is "too far away from the entrance to the Convention Center for our signs to be seen and our chants to be heard by attendees of Art Basel."  Saper Decl., [ECF No. 40-4] ¶ 16.  And because of the location, "[JVP] also could not ask the people passing by the convention center if they would sign our petition."  *Id*.  Defendant presents its own characterization of the Designated Protest Area,

highlighting that it "provides a clear line of sight and sound to the venue[,] . . . borders the only sidewalk used by pedestrians traveling northbound from where most attendees who drive will park[,] [and] is a highly trafficked area where many pedestrians going to Art Basel walk directly past." Diaz Supp. Decl. ¶ 10.

In light of these competing characterizations, the Court considers how significantly the Designated Protest Area limits Plaintiff's speech, and the adequacy of alternative modes of communication. "[T]he law is well-settled that the alternative channel 'does not have to be the speaker's first choice.'" *McDonald*, 556 F. Supp. 3d at 1360 (quoting *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002)). Plaintiff contends that in the Designated Protest Area, "[t]hey no longer have access to their intended audience." Hearing Tr. at 25:22–23. But JVP is still in a position to be seen by thousands of Art Basel attendees and will have the ability to ask these attendees to sign their petitions. The potential loss of audience members as a result of being confined to the Designated Protest Area is not the same as being completely deprived of an audience. Thus, like *Citizens for Peace in Space*, this is "not a case where [Plaintiff is] wholly deprived of their ability to communicate effectively . . . They [are] not wholly cut off from their intended audience[.]" *Amnesty Int'l, USA*, 559 F.3d at 1183 (quoting *Citizens for Peace in Space*, 477 F.3d at 1226). And, unlike the protesters in *Amnesty Int'l, USA*, Plaintiff is not "completely prevented from communicating its message to anyone[.]" *Id.*

Plaintiff has also failed to explain why it cannot access its intended audience in areas other than the sidewalk in front of the Convention Center. Art Basel is not just a one-day, single location event. Miami Art Week lasts a full seven days, with at least nineteen art fairs apart from Art Basel, as well as hundreds of exhibitions and galleries taking place throughout the city. "[T]he regulation does not prohibit [protesting] on other public properties . . . In short, only [protesting within the event security zone] is proscribed; all other methods of communication are left open." *Int'l Caucus*

*of Lab. Committees*, 111 F.3d at 1552.  Plaintiff has a multitude of other ways it can access, communicate with, and interact with its intended audience, other than on the sidewalk directly in front of the Convention Center.  *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988) ("[T]he limited nature of the prohibition [here] makes it virtually self-evident that ample alternatives remain . . . .").

In short, that Defendant's "limitations [] may reduce to some degree the potential audience for [Plaintiff's] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate."  *Ward*, 491 U.S. at 802.  Thus, for purposes of preliminary injunctive relief, Plaintiff has failed to establish that its message will be improperly impacted under the First Amendment.  Nor has Plaintiff been left without ample adequate opportunities to communicate.  Art Basel is not limited to the Convention Center, and Plaintiff has been provided a visible, highly trafficked location in which to protest—even if it is not Plaintiff's preferred location.

## CONCLUSION

At this stage of the proceedings, the Court concludes that Defendant's restriction is content neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels for communication.  Thus, because Plaintiff "ha[s] not shown a substantial likelihood of success on the merits, [the Court] need not consider the remaining factors in the preliminary injunction test."  *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1329; *see also Bloedorn*, 631 F.3d at 1242 ("In as much as [Plaintiff] has failed to establish a substantial likelihood of success on the merits as to any of his claims, we need not, and do not, examine whether he has suffered irreparable harm, or whether a balance of the hardships weighs in his favor, or, finally, whether the public interest would support the issuance of a preliminary injunction.").

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Expedited Motion for Preliminary Injunction, [ECF No. 40], is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 1st day of December, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**